UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TRAILBLAZER FOOD PRODUCTS, INC., an Oregon Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SILGAN WHITE CAP LLC, a Delaware limited liability company,<br><br>Defendant. | 3:17-cv-00417-AC<br><br>ORDER AND OPINION |

ACOSTA, Magistrate Judge:

*Introduction*

Trailblazer Food Products moves to compel Silgan White Cap to produce internal communications pertaining to Silgan's response to Trailblazer's complaint that Silgan made and supplied Trailblazer with negligently manufactured food container lids. Trailblazer also seeks to compel Silgan to produce the business calendars for Silgan employees who attended meetings at which they discussed Trailblazer's complaint. Silgan responds that the attorney work-product doctrine bars discovery of the internal communications Trailblazer seeks because those

Page 1 - ORDER AND OPINION

communications occurred after Trailblazer asserted a claim for damages and otherwise would not have been created.

Silgan seeks a determination from the court regarding disclosure of the content of its Product Specification Reviews ("PSRs") prepared for use in manufacturing lids for customers other than Trailblazer. Silgan itself does not object to producing these PSRs, but at least one of Silgan's customers has objected to its PSRs being provided to Trailblazer and has asked the court to not order its PSRs produced to Trailblazer. Silgan's customer asserts that its PSRs contain proprietary information which, if disclosed to Trailblazer, would severely damage its competitive position in the industry.

Trailblazer's motion (ECF No. 23) to compel is denied. Silgan generated the internal communications in anticipation of litigation and its communications would not otherwise have been created but for Trailblazer's claim for damages. Regarding the objecting customer's PSRs, Silgan is to produce them consistent with this order, as described below.

*Background*

I. The Lids.

    *A.    Trailblazer's complaint.*

Trailblazer manufacturers jams, jellies, and organic fruit spread. Silgan manufacturers and supplies lids for food and beverage products, and it applies a protective coating to the underside of its lids to fit the specific characteristics of the food product the lid will cover. Trailblazer discovered a black substance on the inside of lids that Silgan manufactured for Trailblazer in 2016 for use in packaging Trailblazer's organic fruit spread. In its lawsuit,

Trailblazer alleges that Silgan negligently applied the wrong number of coatings to the lids it sold to Trailblazer.

Trailblazer first notified Silgan of the non-conforming lids on October 18, 2016. Silgan investigated Trailblazer's complaint and responded to Trailblazer on October 26, 2016. During the following two weeks the parties continued to discuss what had become an on-going problem for Trailblazer and Silgan's further investigation to determine its cause.

On November 14, 2016, Rob Miller, Trailblazer's CEO, emailed Silgan that one of Trailblazer's customers announced it was "no longer going to be selling the product" because its own customers had returned the product because of the black substance. Miller then said:

> Understanding that you need to continue your work to determine why there are fissures/pits in the [lid's inside] coating, we need to change gears and talk about the financial impact of the coating failure.
>
> Preliminarily, we have direct damages of approximately $7.5mm and indirect damages of $2.0mm and we need to start a conversation, <u>right now,</u> with senior management at Silgan about how to address the damages.

(ECF No. 23, Ex. B., at 6 (underline in original).) Miller then asked for the contact information "of the person best able to address the financial issues associated with the coating failure[.]" (*Id.*)

### B. *Silgan's Customer Incident ("CI") Process.*

Silgan follows the procedure contained in its CI Process policy ("the Policy") (ECF No. 30, Ex. A) for responding to customer complaints. Relevant to Trailblazer's motion is the "Procedure" section of the Policy that mandates the steps to be taken for investigating and responding to every customer complaint:

**PROCEDURE:**

A. CI Submission:
  1. The CAS is responsible for entering the CI into the system.
  2. To log into the Silgan CI system:
     a. Go to: https://sharepoint/silganmfg.com/sites/swcintranet/default.aspx, under Customer Complaints
     b. Enter login name and password
  3. The CAS is to enter <u>ALL</u> necessary CI information. The <u>Complaint Summary</u> section must include specific information surrounding what happened, the impact to the customer, the frequency of the issue, and any other pertinent facts. Details will facilitate more thorough investigation, root cause analysis, and corrective actions.
  4. It is critical that physical samples and/or digital photographs of defective product be provided to the CI recipient as quickly as possible. Digital photographs and other electronic documents should be attached to the CI.
  5. The CI number will be automatically assigned. The CI will be automatically sent to a fixed distribution list based upon the plant of manufacture and the claim amount associated with the CI.

CIs are permanent records of customer issues and are intended to be shared with the customer. For these reasons, entries should be professional and follow these additional guidelines:

- Customer emails are not to be copied and pasted into the Complaint Summary section. The relevant information from customer emails should be summarized in the Complaint Summary section.
- If a personal name is used in an entry, the title of the person named should also be included.

B. CI Response:
  1. The CAS is responsible for sending a complaint receipt acknowledgement to the customer within two working days of notification.
  2. All CIs require a thorough investigation, root cause analysis, and corrective action. The CI response must contain a <u>detailed</u> investigation summary, documentation of records review, systems in place, analysis of system failure, root cause(s), and corrective

|   | action. The corrective action must include a process change and/or equipment modification. Retraining is not a corrective action. |
|---|---|
| 3. | **The Plant Quality Manager or designee is responsible for conducting an INVENTORY REVIEW when a CI is received to evaluate risk to Silgan and customer inventories. A copy of the Inventory Review is to be kept on-file.** |
| 4. | The target for CI response completion is within 21 calendar days after receiving the samples. |
| 5. | In some cases, a 21 day response time is not possible due to the complexity of the issue. In cases where a 21 day response time is not possible, the Plant Quality Manager (or responsible party in the case of sales CIs) is responsible for issuing an initial response. Either the completed response or the initial response is due to the customer within 21 calendar days of receiving samples. |
| 6. | An initial response is a phone call or email update to the customer regarding the investigation and resolution of the issue. |
| 7. | The Plant Quality Manager is responsible for entering all CI response information. |
| 8. | Attachments can be uploaded electronically to the CI response. |
| 9. | Once the response is saved and routed, an internal copy goes to the Plant Manager who is responsible for issuing the final approval. |
| 10. | After Plant Manager approval, the CI response is closed and is sent to the entire fixed distribution for the manufacturing facility. |

C.  CI Withdrawal/ Redirect/ Reclassify:
When it is discovered that a CI should be withdrawn, redirected or have a status change (i.e. moved from a level one to a level two CI) the recipient of the CI must make such request <u>in writing</u>. The written request should be sent to the CAS, Director of Customer Service, Plant Quality Manager, and Corporate Quality Manager. The written request should contain all pertinent data supporting the withdrawal, re-direction, or change in status. The Director of Customer Service will authorize all re-directs, transfers, or changes to the status of a CI.

(ECF No. 30, Ex. A, at 2-3 (bold, underline, and all capitals emphasis in original).)

  *C.*  *Silgan's response to Trailblazer's complaint.*

Silgan entered Trailblazer's complaint into Silgan's system on October 18, 2016, using what appears to be a PDF fillable form designed for implementing the Policy's steps. (ECF No. 30, at 7.) Under "Complaint Summary" Silgan entered this description: "Customer is

Page 5 - ORDER AND OPINION

complaining about unknown substance inside the cap. Tony [DeFrancesco] is looking into this. Pictures attached." Under "Investigation Summary," Silgan stated:

> The customer, Trailblazer Foods, has complained that after filling [the food containers] an unknown substance is present on the inside of the caps after the strawberry preserves are opened. They are concerned that the substance appears to be corrosion.
>
> Samples of the closures that were opened were sent to the plant and forwarded to Downers Grove for testing. Samples that arrived at the plant had a grey substance stuck to the inside surface of the closure, mostly around the plastisol/coating interface This substance could easily be removed and when removed it revealed no coating breaks under the substance. Samples were forwarded to Downers Grove for testing.
>
> Closures were washed, all of the substance on the closures washed off in water. No coating breaks or corrosion was evident. Closures were then tested in copper sulfate. Again, not corrosion was noted. Unknown substance is not corrosion. Report from Downers Grove lab is attached.

(ECF No. 30, at 7-8.) Under "Corrective Action/Root Cause" Silgan concluded: "The origin of the substance inside the processed samples is unknown. This substance is not corrosion." (ECF No. 30, at 8.)

On October 26, 2016, Tony DeFrancesco, Silgan's West Coast Technical Service Supervisor, emailed to Silgan a copy of a lab report containing Silgan's test results of exemplar non-confirming lids. (ECF No. 26, Ex. A.) The report contained photographs of the lids, showing the undersides of the lids before and after testing, along with captions outlining the testing steps. (ECF No. 26, Ex. A, at 5-6.) The report stated two conclusions, first that the "substance on the surface of the closure was not a result of coating failure," and second that the "source of the substance on the surface of the closure was indeterminate." (ECF No. 26, Ex. A, at 6.)

Page 6 - ORDER AND OPINION

### D. *Silgan's response to Trailblazer's November 14, 2016 email.*

At some point after receiving Miller's November 14, 2016 email, Daniel Carson, Silgan's Sr. Vice President and General Counsel, took steps to coordinate Silgan's response to and preparation for what he believed would become a legal claim. (ECF No. 28, at 1-2.) Distinct from Carson's experience with other customer complaints was Trailblazer's assertion of significant damages and its request for the involvement of Silgan's high-level management. (ECF No. 28, at 2.) Carson began communicating with Silgan employees likely to be involved in Silgan's further response and he began to assess Silgan's future strategy for defending Trailblazer's claim. (ECF No. 28, at 2.) Carson also notified Silgan's insurers of Trailblazer's claim, took steps to preserve relevant documentation, and acted to protect as privileged Silgan's internal communications about the claim. (ECF No. 28, at 2.) Carson stated that these steps and his involvement were not typical in responding to a customer complaint. (ECF No. 28, at 2.)

Trailblazer filed its lawsuit against in Multnomah County Circuit Court on January 18, 2017, and added Silgan as a defendant on February 17, 2017. Silgan removed the case to this court on March 14, 2017.

## II. The PSRs.

Package Specification Reviews ("PSRs") are Silgan-created forms used to identify the customer's product and document the product's characteristics, such as pH level and the presence or absence of vinegar. Silgan uses the information in the PSRs to design a lid suitable for the particular product's characteristics, including the proper number of coating layers to apply to the underside of the lid.

Trailblazer alleges Silgan should have applied two coating layers instead of one to the undersides of the lids it made for Trailblazer. During discovery Trailblazer served a request for production on Silgan asking for PSRs for other Silgan customers. Trailblazer contends other customers' PSRs are relevant to inform Trailblazer whether the specification Silgan designed and applied to Trailblazer's lids was consistent with Silgan's practices and procedures.

Silgan itself does not object to the relevancy of the PSRs Trailblazer seeks and does not object to Trailblazer receiving those documents, but one of Silgan's customers does object to the production of its products' PSRs. The objecting customer contends that disclosure of its products' PSRs would reveal propriety information to its competitors in the industry and damage its market competitiveness. The objecting customer asserts that neither redaction or a protective order is adequate to address these risks. Trailblazer responds that Silgan produced relevant PSRs for all its other customers in unredacted form, and that none of Silgan's other customers objected to the production of their PSRs or required Silgan to redact them.

*Standards*

I.  Work Product.

The discovery provisions of the Federal Rules of Civil Procedure do not entitle an opposing litigant to "invad[e] the privacy of an attorney's course of preparation[.]" *Hickman v. Taylor*, 329 U.S. 495, 512 (1947). The work product doctrine announced in *Hickman* protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. United States District Court*, 881 F.2d 1486, 1494 (9th Cir.1989). *See also* FED R. CIV. P. 26(b)(3) (stating that documents prepared in anticipation

Page 8 - ORDER AND OPINION

of litigation generally are not subject to discovery). To qualify for work-product protection, documents must: (1) be " 'prepared in anticipation of litigation or for trial,' " and (2) be prepared "by or for another party or by or for that other party's representative.' " *In re California Pub. Utils. Comm'n*, 892 F.2d 778, 780-81 (9th Cir. 1989) (quoting FED. R. CIV. P. 26(b)(3)).

"The work-product rule is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co.*, 881 F.2d at 1494. The primary purpose of the work product rule is to "prevent exploitation of a party's efforts in preparing for litigation." *Id.* Work product protection applies to materials prepared by non-lawyers. *Nichol v. City of Springfield*, No. 6:14-cv-1983-AA, 2015 WL 13229184, at *2 (D. Or. Dec. 18, 2015) (observing that work product protection expanded on the rule announced in *Hickman* in 1970 as Federal Rule of Civil Procedure 26(b) (3)), citing 1970 Advisory Committee Notes to FED. R. CIV. P. 26 (b)(3) (identifying "confusion and disagreement as to the scope of the *Hickman* work-product doctrine, particularly whether it extends beyond work actually performed by lawyers" as one of the "major difficulties visible in the [pre-1970] case law").

Determining whether or not to extend work-product protection to a particular document may turn on whether the document was created for a "single purpose" or for a "dual purpose." A single-purpose document is one created exclusively in anticipation of litigation and clearly passes the two-part test for work-product protection stated in *California Public Utilities*. *U.S. v. Torf*, 357 F.3d 900, 907 (9th Cir. 2004). A dual-purpose document is one created both in

anticipation of litigation but also for an independent non-litigation purpose that would have prompted the document's creation in the same or a substantially similar form. *Id.* at 907-08. Thus, a document created in the normal course of a party's business operations but also relevant to an anticipated lawsuit might be subject to discovery. *See, e.g., Amy's Kitchen v. Stukel Mountain Organics LLC*, Case No. 1:16-cv-00071-CL, 2016 WL 9406695, at *3 (D. Or. Sept. 28, 2016) ("Even if a document is prepared partially for litigation and partially in the normal course of business – *i.e.*, for a "dual purpose" – the Court must consider the totality of the circumstances to determine whether or not it would have been created in a substantially similar form but for the prospect of litigation.").

Dual-purpose documents are subject to the "because of" standard: a document should be deemed prepared "in anticipation of litigation" and thus eligible for work-product protection under Rule 26(b)(3) if " 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.' " *U.S. v. Torf*, 357 F.3d at 907, quoting CHARLES ALAN WRIGHT, ARTHUR R. MILLER, and RICHARD L. MARCUS, 8 FEDERAL PRACTICE & PROCEDURE § 2024 (2d ed. 1994). The "because of" standard does not consider whether litigation was a primary or secondary motive behind the creation of a document, but instead considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]" *U.S. v. Torf*, 357 F.3d at 908 (citation omitted). "When there is a true independent purpose for creating a document, work product protection is less

likely, but when two purposes are profoundly interconnected, the analysis is more complicated." *Id.* at 908. Dual-purpose documents will be afforded work-product protection if "their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id.* at 910.

II.  Discovery.

"Parties may obtain discovery of regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" FED. R. CIV. P. 26(b)(1). The court may enter a protective order to limit the extent of and conditions for allowing discovery, including "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way[.]" FED. R. CIV. P. 26(c).

*Discussion*

I.  Silgan's Internal Communications After November 14, 2016, Are Protected by the Attorney Work-Product Rule.

    *A.   Attorney involvement in Silgan's internal communication is not a prerequisite to the work-product rule's protection.*

The parties' respective briefing presumes the involvement of legal counsel is a precondition to the work-product rule's protection, but some of the internal communications Silgan provided for *in camera* review do not appear to have involved Carson. Silgan accompanied its *in camera* documents with declarations from Carson and from Joshua Chesney, Corporate Quality Manager for Silgan Closures and, a member of the team involved in responding to Trailblazer's claim. Missing from both declarations and from Silgan's briefing is any reference to the date on which Carson received notice of Trailblazer's claim. If attorney

involvement is a necessary to the work-product rule's protection, then the date of Carson's first involvement is relevant to resolving whether some or all of the internal communications Trailblazer seeks are eligible for work-product protection.

The first evidence of Carson's involvement in Silgan's internal discussions about the Trailblazer claim is as a "cc" recipient of a November 23, 2016 email sent among the Silgan employees responsible for responding to Trailblazer's November 14, 2016 claim. Carson's name does not appear as a sender, direct recipient, or "cc" recipient on any of Silgan's internal communications created from November 14 through November 22. If those documents did not involve Carson and he did not direct their creation, then there is a question whether those documents may be eligible for work-product protection.

The court concludes that attorney involvement is not a precondition under Rule 23(b)(3)(A) for work-product protection, so long as the materials are created in anticipation of litigation. The starting point is explicit the language of the rule, which states in part that "a party may not discover documents and tangible things <u>that are prepared in anticipation of litigation</u> or for trial <u>by or for another party or its representative</u> (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)[.]" (Underlining added.) The rule brings within its protection documents prepared by a party <u>or</u> that party's "representative" – a term defined as "including the . . . party's attorney." By distinguishing between a party and its attorney and applying its protection to document prepared by either group, the rule makes clear that documents prepared without attorney involvement are protected work product.

In *Nichol v. City of Springfield, et al.*, No. 6:14-cv-1983-AA, 2015 WL 13229184 (D. Or. Dec. 18, 2015), Judge Aiken of this district reached the same conclusion on similar facts. Defendants sought materials plaintiff sent to and received from a former co-worker discussing strategy for plaintiff's possible lawsuit against the City, an exchange not involving an attorney or conducted at an attorney's direction. *Id.* at *1. Defendants moved to compel plaintiff to produce these materials, arguing in part that the documents were not sent to or received from plaintiff's "representative" and thus did not qualify for work-product protection. *Id.* at *3.

Citing *Torf* and "the plain meaning of the text" of Rule 26(b)(3)(A), Judge Aiken found the plaintiff's materials to be protected work product. *Nichol*, 2015 WL 13229184, at *3. Judge Aiken rejected the defendants' arguments that work-product protection should not apply to the documents because no lawyer received or sent the materials, that no lawyer directed their exchange or creation, and that the person with whom plaintiff corresponded was not her "representative":

> It is true courts generally have applied Rule 26(b) (3)'s protections to materials prepared by a non-lawyer where the non-lawyer either acted as a party's representative or acted under instructions from a party's representative. . . . . The dearth of case law matching the precise fact pattern here, however, does not authorize the court to ignore the plain meaning of Rule 26(b)(3). As one commentator has explained, although most work-product cases discuss materials generated by attorneys and agents of attorneys,
>
>> those cases should not be read as casting doubt on the clear scope of Rule 26 (b)(3). Instead, their language should be considered as identifying the creator of the work product in that case or as reflecting the norm. Since most work product is attorney-generated, the language of the cases may merely reflect this typical occurrence.
>
> John W. Gergacz, Attorney-Corporate Client Privilege §7:21 (3d ed. 2015).

*Nichol*, 2015 WL 13229184, at *3-*4 (case citations omitted). Judge Aiken concluded that the rule's plain language protected as work-product the materials plaintiff had exchanged with her former co-worker because those materials were created in anticipation of litigation.

This court concludes here that Silgan created its internal communications in anticipation of litigation. The parties do not seriously dispute that November 14, 2014, is the date on which Silgan reasonably anticipated litigation by Trailblazer and the record firmly supports that conclusion. Miller's email lacked the collaborative and patient tone that permeated his previous emails about the non-conforming lids, and substituted in its place explicit mention of "damages" in the millions of dollars coupled with a demand to be put in contact with a senior Silgan management member to discuss "how to address" those damages. At that point, the focus of Silgan's internal communications shifted from exploring the source of the lids' failure to positioning Silgan to defend against Trailblazer's damages claim.

Because Silgan's internal communications were created in anticipation of litigation and attorney involvement is not necessary for Rule 23(b)(3)(A)'s protection to apply, all of Silgan's internal communications at issue here are eligible for protection under that rule.

    B.    *The internal communications were created primarily to defend against Trailblazer's claim and would not otherwise have been created.*

Trailblazer contends the documents are not entitled to work-product protection if their creation resulted from Silgan's ordinary business practice for responding to customer complaints, but this argument fails for two reasons. First, the record establishes that on October 18, 2016, Silgan began following its normal course of business in response to Trailblazer's complaint by implementing each of the steps mandated under the Policy, and that Silgan

Page 14 - ORDER AND OPINION

completed that process on October 26, 2016. Upon receiving Trailblazer's complaint Silgan entered the information about the complaint into its system, using a format designed for that purpose; it investigated Trailblazer's complaint to determine the cause of the non-conforming lids; it generated a report of its investigation that contained both a detailed summary of the investigation and photos of the tested lids; and it provided an analysis of the problem and a conclusion about its cause. Silgan then provided its completed report to Trailblazer on October 26, 2016, eight days after Trailblazer's initial complaint and well within the required 21-day time limit under the Policy.

The Chesney declaration (ECF No. 30) establishes that implementing the Policy is Silgan's normal business response to customer complaints, and there is no evidence to refute his testimony. Furthermore, Chesney's testimony is consistent with the record: the documents Silgan generated between October 18 and October 26, 2017, and their content match the steps the Policy requires Silgan to take in response to a customer complaint. The final step under the Policy occurred on October 26, 2017, when Silgan provided Trailblazer with its report of the investigation – almost three weeks before Miller's November 14, 2016 demand email.

Second, the *in camera* documents show that the purpose which permeated the creation of the internal communications was defending Trailblazer's legal claim. The documents show that after they received Miller's email, the Silgan employees tasked with responding to Trailblazer's complaint shifted their focus from problem-solving with Trailblazer to defending against Trailblazer's imminent lawsuit. Furthermore, none of the documents created after November 14,

2016, mirror the steps required under the Policy. Silgan would not have created the documents in the same or substantially similar form in the normal course of business, but for Miller's email.

Accordingly, Silgan's internal communications are within the scope of Rule 26(b)(3)(A)'s protection and they are protected work-product. Trailblazer's motion to compel their production is DENIED.[1]

II. The PSRs Are Discoverable In Redacted Form.

At issue is whether Silgan negligently designed Trailblazer's lids for the specified product. Relevant to that determination is the process Silgan used to determine the specifications for the Trailblazer lids, including the number of coatings to be applied to the underside of those lids, and whether the specifications Silgan applied to Trailblazer's lids was consistent with Silgan's practices and procedures. At oral argument Trailblazer argued that the additional PSR information for the objecting customer's product is relevant in part because the number of PSRs is limited: there are only a handful of Silgan customers whose products are substantially similar to the Trailblazer product at issue, thus increasing the importance of the objecting customer's PSRs.

The court finds the objecting customer's PSRs must be produced. The PSRs are relevant to Trailblazer's claim against Silgan, a conclusion Silgan concedes and the objecting customer does not dispute. With relevancy established, the objecting customer's concerns that trade secret information are not sufficient to deny Trailblazer relevant evidence.

---

[1] At oral argument on November 3, 2017, the court denied Trailblazer's motion with respect to Silgan employee's calendars.

Page 16 - ORDER AND OPINION

The remaining question is the form in which the objecting customer's PSRs must be produced. The court finds that the format and conditions Trailblazer proposed in its October 31, 2017 letter achieves an acceptable balance of Trailblazer's right to relevant evidence and the objecting customer's concerns about the disclosure of its trade secrets and propriety information.[2] Accordingly, the court orders that the objecting customer's PSR be produced consistent with these conditions:

1. The documents are to be produced in a manner that redacts the objecting customer's identity so as to avoid them being mistakenly circulated in a manner inconsistent with this Opinion and Order;

2. The documents are to be produced under the designation "Confidential" as set forth in the parties' Stipulated Protective Order (ECF No. 14);

3. The objecting customer's identity is to be disclosed to TBF's attorney under the same "Confidential" designation but with the further restriction that the identity may be shared with only one representative of Trailblazer; and

4. The designated Trailblazer representative shall not disclose the objecting customer's identity to any other individual.

Accordingly, Trailblazer's request for the objecting customer's PSR is GRANTED. The objecting customer's PSR shall be subject to the requirements of the court's previously entered protective order (ECF No. 14). Violation of any of the above conditions for disclosure of the objecting customer's PSR will result in sanctions, including preclusive or terminating sanctions, as might be appropriate.

\\\\\

---

[2] This parties submitted their PSR dispute to the court informally. Their correspondence is filed with this Opinion and Order.

*Conclusion*

Trailblazer's motion (ECF No. 23) to compel is DENIED. Trailblazer's oral motion that Silgan produce the objecting customer's PSR is GRANTED.

IT IS SO ORDERED.

DATED this 30th day of November, 2017.

JOHN V. ACOSTA
United States Magistrate Judge